NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| 18W HOLDINGS, INC.,<br><br>            Plaintiff,<br><br>v.<br><br>SING FOR SERVICE, LLC *d/b/a* MEPCO,<br><br>            Defendant. | Civil Action No. 20-15007 (SDW) (LDW)<br><br>OPINION<br><br>December 27, 2021 |

**WIGENTON**, District Judge.

Before this Court is Defendant Sing for Service, LLC's ("Defendant" or "Mepco") Motion to Partially Dismiss Plaintiff 18W Holdings, Inc.'s ("Plaintiff" or "18W") Amended Complaint, (D.E. 25 ("Am. Compl.")), for failure to state a claim pursuant to Federal Rules of Civil Procedure ("Rule") 9(b) and 12(b)(6). Jurisdiction is proper pursuant to 28 U.S.C. § 1332. Venue is proper pursuant to 28 U.S.C. § 1391. This opinion is issued without oral argument pursuant to Rule 78. For the reasons stated herein, Defendant's motion is **GRANTED**.

**I.    BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff is a New Jersey corporation that sells extended vehicle warranties, also known as vehicle service contracts ("VSCs"). (Am. Compl. ¶¶ 4, 8.) Defendant is a Delaware company, with its principal place of business in Illinois, that services payment plans for sellers and administrators of VSCs. (*Id.* ¶¶ 5, 13.) In October 2019, the parties entered into a contract whereby Defendant agreed to service payment plans for VSCs that Plaintiff sold. (*Id.* at Ex. A (the "Dealer

Agreement"); *see also* Dealer Agreement § 1(c) (referring to the parties' arrangement as the "Payment Plan Program").)

During the negotiation of the Dealer Agreement, Michael LaMotta, Plaintiff's General Manager, and Tony Wong, Defendant's Vice President, discussed AA Auto Holdings, Inc. ("AA Auto"). (*See* Am. Compl. ¶¶ 18–34.) AA Auto had a business relationship with Defendant and was in a difficult financial situation due to the allegedly wrongful actions of Dan Rorapaugh, who had a 40% interest in AA Auto. (*Id.* ¶¶ 19–21.) Plaintiff's parent company, MEM Investments, Inc. ("MEM Investments"), held the remaining 60% interest in AA Auto. (*Id.* ¶¶ 21–22.) Additionally, Plaintiff and AA Auto had some of the same individuals on their senior management teams. (*Id.* ¶ 31.)

In view of these overlaps, Plaintiff's leadership stated that it would enter into an agreement with Defendant only if Defendant recognized that Plaintiff and AA Auto were independent corporate entities. (*Id.* ¶ 27.) Mr. Wong acknowledged that Defendant would sign Plaintiff as a new client on those terms, subject to written confirmation that Mr. Rorapaugh had no interest in or control of Plaintiff. (*Id.* ¶ 28.) According to the Amended Complaint, Mr. Wong specifically promised that Defendant would not take any adverse action against Plaintiff based on Defendant's relationship with AA Auto. (*Id.*) Mr. Wong also promised that Defendant's customer service agents would keep separate business records for Plaintiff and limit their communications with Plaintiff's customers to Plaintiff's business (as opposed to that of AA Auto), in order to preserve Plaintiff's goodwill and reputation. (*See id.* ¶ 43.) Mr. Wong also addressed Mr. LaMotta's concerns about the quality of Defendant's customer service by promising that Defendant would "immediately notify 18W when its customers dispute[d] charges" and that "Mepco's agents would be easily accessible and would respond promptly to 18W's customers." (*Id.* ¶ 42.) Plaintiff

alleges that it relied on these representations when it signed the Dealer Agreement, which does not reference AA Auto or its outstanding liabilities. (*Id.* ¶¶ 33–34, 44, 62.)

In January 2020, Plaintiff began offering VSCs with the option of payment services provided by Defendant. (*Id.* ¶ 40.) Under the terms of the Dealer Agreement, Defendant was required to provide funding to Plaintiff on a weekly basis for the payment plans that it accepted for servicing. (*See id.* ¶ 36; Dealer Agreement §§ 3, 4.) Defendant made the first two weekly funding payments to Plaintiff but withheld the funding payments due on March 12 and March 19, 2020. (Am. Compl. ¶¶ 47, 49.) Plaintiff alleges that Defendant withheld the payments without notice, complaint, or claim of insecurity. (*Id.* ¶¶ 47, 49.)[1] Instead, Mr. Wong wrote to Mr. LaMotta, stating, "[W]e need to put together a repayment schedule/program on the outstanding liabilities of with [sic] AA Auto so that we can release the funding today." (*Id.* ¶ 54.) Plaintiff notified Defendant that it was in breach of its contractual obligations under the Dealer Agreement and that Defendant had no legitimate basis to seek recovery from Plaintiff, a different corporate entity. (*See id.* ¶¶ 50, 52.) However, Defendant refused to release payment and Plaintiff therefore terminated the Dealer Agreement on March 27, 2020. (*Id.* ¶ 64.)

After Plaintiff terminated its relationship with Defendant, Plaintiff's customers began cancelling their VSCs at a higher rate. (*See id.* ¶¶ 11, 76.) Plaintiff subsequently learned that Defendant's customer service representatives had made allegedly false and disparaging statements to Plaintiff's customers about Plaintiff. (*Id.* ¶ 70.) These alleged misrepresentations included statements that Plaintiff and AA Auto were the same company, that Plaintiff merely changed its name and phone number to avoid liability, and that Plaintiff was out of business. (*Id.* ¶ 71.)

---

[1] Defendant argues that it exercised its right to claim insecurity and properly withheld funding under the terms of the Dealer Agreement. (*See* D.E. 26-1 at 2; Dealer Agreement § 7.)

Additionally, Defendant was unresponsive to inquiries from Plaintiff's customers and did not validate charges that the customers disputed. (*Id.* ¶ 74.) According to the Amended Complaint, Defendant earned its administrative fee in full after a customer made two monthly payments, and thus had no incentive to support Plaintiff's customers thereafter or prevent the cancellation of their VSCs. (*See id.* ¶¶ 37, 75.)

Plaintiff filed the instant suit on October 26, 2020, and filed the Amended Complaint on May 26, 2021. (D.E. 1, 25.)[2] The Amended Complaint asserts five counts: breach of contract (Count I); fraud, based on Defendant's efforts to collect the debts of AA Auto through Plaintiff (Count II); tortious interference with prospective economic advantage (Count III); breach of the implied covenant of good faith and fair dealing (Count IV); and fraud, in inducing Plaintiff to enter into the Dealer Agreement based on false promises (Count V). Defendant subsequently moved to dismiss Counts II – V of the Amended Complaint (the non-contract claims), and briefing was timely completed. (D.E. 26, 29, 32.)

## II.  LEGAL STANDARDS

An adequate complaint must be "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This Rule "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted); *see also Phillips v. Cty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (stating that Rule 8 "requires a 'showing,' rather than a blanket assertion, of an entitlement to relief").

---

[2] Prior to the instant lawsuit, Mepco filed a claim for declaratory judgment in the Northern District of Illinois. The district court there granted 18W's motion to transfer that action to this forum and dismissed Mepco's declaratory judgment claim without prejudice. *See Sing for Serv., LLC v. 18W Holdings, Inc.*, Civ. No. 20-4018, 2021 WL 392701 (N.D. Ill. Feb. 4, 2021).

When considering a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips*, 515 F.3d at 231 (citation omitted).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009) (discussing the *Iqbal* standard).  Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to "show[] that the pleader is entitled to relief" as required by Rule 8(a)(2). *Id.*

Pursuant to Rule 9(b), plaintiffs alleging fraud must "meet a heightened pleading standard by 'stat[ing] with particularity the circumstances constituting fraud[.]'" *N.Y. City Emps.' Ret. Sys. v. Valeant Pharm. Int'l, Inc.*, Civ. No. 18-0032, 2018 WL 4620676, at *2 (D.N.J. Sept. 26, 2018) (quoting Fed. R. Civ. P. 9(b)).  Plaintiffs can satisfy this heightened standard by alleging dates, times, places and other facts with precision. *Park v. M & T Bank Corp.*, Civ. No. 09-2921, 2010 WL 1032649, at *5 (D.N.J. Mar. 16, 2010).

### III. **DISCUSSION**

Defendant argues that Counts III – V are barred by the existence of an express contract with a clear integration clause, and that Counts II, III, and V are not pleaded with the particularity

5

required by Rule 9(b). (*See* D.E. 26-1 at 1.) This Court addresses some of Defendant's arguments below and, for the reasons discussed, will dismiss Counts II – V without prejudice.

> A. **Tortious Interference and Breach of the Covenant of Good Faith and Fair Dealing (Counts III & IV)**

Plaintiff's tortious interference claim is based on allegations that Defendant failed to respond to customer inquiries and made false and defamatory statements to customers. (Am. Compl. ¶¶ 99–100; *see id.* ¶¶ 70–76.) To succeed on a claim for tortious interference, a plaintiff must show "(1) the existence of a contract or of a 'reasonable expectation of economic advantage;' (2) an intentional and unjustifiable interference with the contract or expectation by defendant; (3) the interference caused the loss of contract or prospective gain; and (4) the injury caused the damage to the plaintiff." *Dando v. Bimbo Food Bakeries Distribution, LLC*, Civ. No. 14-2956, 2016 WL 475262, at *4 (D.N.J. Feb. 8, 2016) (quoting *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 37 (N.J. 1989)). However, "[t]he economic loss doctrine prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from contract." *Chen v. HD Dimension Corp.*, Civ. No. 10–863, 2010 WL 4721514, at *8 (D.N.J. Nov. 15, 2010) (quotation omitted). "[W]hether a tort claim can be asserted alongside a breach of contract claim depends on whether the tortious conduct is extrinsic to the contract between the parties." *Id.* (quotation omitted).

Here, the Dealer Agreement defines Defendant's obligations in customer service interactions by expressly integrating Defendant's policies and procedures related to the Payment Plan Program:

> Entire Agreement. This Agreement, together with any policies, procedures, documents, notice, or other evidence of any kind related to [Mepco]'s requirements, policies, and procedures for the Payment Plan Program or any aspect of the Payment Plan Program, contains the entire agreement between the parties regarding its subject matter and supersedes any previous and contemporaneous negotiations,

>representations, and agreements between the parties with respect to such subject matter, whether written or verbal.

(Dealer Agreement § 13(j).) Plaintiff's tortious interference claim, based on allegations that Defendant failed to respond to customer inquiries and made false and defamatory statements to customers, therefore arises from conduct that is intrinsic to the Dealer Agreement. Count III is thus subsumed by Plaintiff's breach of contract claim and barred by the economic loss doctrine.

Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is also based on allegations that Defendant made false statements to customers and failed to respond to customer inquiries, causing customers to prematurely cancel their VSCs. (Am. Compl. ¶ 103.)[3] "Every contract in New Jersey contains an implied covenant of good faith and fair dealing. . . . [which] requires a party to refrain from destroying or injuring the right of the other party to receive its contractual benefits." *China Falcon Flying Ltd. v. Dassault Falcon Jet Corp.*, 329 F. Supp. 3d 56, 74 (D.N.J. 2018) (quotations omitted). "[A] party exercising its right to use discretion . . . under a contract breaches the duty of good faith and fair dealing if that party exercises its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract." *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1130 (N.J. 2001). However, "the covenant is to be interpreted narrowly, lest it become an all-embracing statement of the parties' obligations under contract law, imposing unintended obligations upon parties and destroying the mutual benefits created by legally binding agreements." *Cargill Glob. Trading v. Applied Dev. Co.*, 706 F. Supp. 2d 563, 580 (D.N.J. 2010) (quotation omitted).

---

[3] Paradoxically, Plaintiff alleges that the conduct supporting its tortious interference claim is the same conduct which supports its claim for breach of the implied contractual covenant of good faith and fair dealing. (*Compare* Am. Compl. ¶ 99, *with id.* ¶ 103.) Plaintiff thereby argues that Defendant's interactions with Plaintiff's customers violated obligations that were simultaneously intrinsic and extrinsic to the Dealer Agreement.

7

As discussed above, the Dealer Agreement integrates Defendant's own policies and procedures regarding the Payment Plan Program into the Dealer Agreement. The specific reference to Defendant's "policies" and "procedures" regarding the Payment Plan Program is evidence that the parties *did* consider the matter of Defendant's customer service but opted to rely on Defendant's existing policies and procedures rather than impose new or different standards on Defendant. Especially telling is that Plaintiff alleges that it discussed its concerns about Defendant's customer service policies with Defendant *before* signing the Dealer Agreement and agreeing to its integration clause. (*See* Am. Compl. ¶¶ 42–43.) If Plaintiff required Defendant to meet another standard of customer service, it could have bargained for that standard to be included in the contract. Plaintiff cannot now rewrite the contract, impose new standards, or get more than it bargained for through application of the implied covenant of good faith and fair dealing. *See In re Petersburg Regency LLC*, 540 B.R. 508, 542 (Bankr. D.N.J. 2015) (observing that "the duty of good faith and fair dealing . . . may not be used to make a better deal for a party [than the one] that he or she negotiated" (citing *Glenfed Fin. Corp. v. Penick Corp.*, 647 A.2d 852, 857–58 (N.J. Super. Ct. App. Div. 1994))). Count IV will therefore be dismissed. If Defendant's statements to customers and failure to respond to customer inquiries did not meet the standard of customer service that the parties agreed to when they signed the Dealer Agreement, then Plaintiff can seek damages from Defendant via its breach of contract claim.

    **B.**    **Fraudulent Inducement (Counts II & V)**

Count II asserts that "Mepco knowingly induced 18W to enter into the Dealer Agreement by representing that it would treat 18W and AA Auto [] separately when Mepco actually intended to collect AA Auto['s] debts through 18W." (Am. Compl. ¶ 95.) To succeed on a claim for fraudulent inducement, a plaintiff must establish: "(1) a material representation of a presently

8

existing or past fact; (2) made with knowledge of its falsity; and (3) with the intention that the other party rely thereon; (4) resulting in reliance by that party; (5) to his detriment." *RNC Sys., Inc. v. Modern Tech. Grp., Inc.*, 861 F. Supp. 2d 436, 451 (D.N.J. 2012) (citation omitted). Under Rule 9(b), the circumstances constituting fraud must be pleaded "with particularity." As such, a plaintiff must allege "the who, what, when, where, and how of the events at issue," but need not include "the date, time, place, or content of every single allegedly false [] claim." *United States ex rel. Bookwalter v. Univ. of Pitt. Med. Ctr.*, 946 F.3d 162, 176 (3d Cir. 2019) (quotation omitted).

The Amended Complaint contains several allegations about the negotiation process, (*see, e.g.*, ¶¶ 18–21, 26–34), but lacks detailed allegations regarding the conversations or correspondence in which Defendant promised that it would not attempt to "collect AA Auto['s] debts through 18W." (*Id.* ¶ 95.) There is an allegation that, "during a conference call with Mr. LaMotta and Michael Wymard, an employee of 18W, Mr. Wong stated that Mepco would enter into a business relationship and treat 18W as an independent business entity subject to written confirmation that Mr. Rorapaugh had no interest in or control in 18W." (*Id.* ¶ 28.) During this call, "Mr. Wong specifically promised that Mepco would not take any adverse action against 18W based on its pre-existing relationship with AA Auto[.]" (*Id.*) There is no allegation as to when this phone call occurred or how the representation was worded. However, assuming that the allegation is true, there are no factual allegations that the representation was false at the time that it was made, or that the representation was made with knowledge of its falsity, as required to state a claim for fraudulent inducement. *See RNC Sys.*, 861 F. Supp. 2d at 451.

Nor does the Amended Complaint as a whole support a plausible inference that it was Defendant's statement that actually caused Plaintiff to enter into the Dealer Agreement. *See id.* (requiring the representation to "result[] in reliance"). In fact, the pleading as a whole portrays

9

Defendant as skeptical of the separation between Plaintiff and AA Auto, with Plaintiff repeatedly having to assure Defendant that it was separate from AA Auto, even on the day that it transmitted the signed Dealer Agreement. (*See* Am. Compl. ¶ 20 ("Mr. LaMotta confirmed to Mr. Wong that 18W was a different corporate entity separate from AA Auto[.] Mr. LaMotta explained that 18W maintained separate business records, financial accounts, and had a different control/ownership group."); ¶ 29 ("To reassure Mr. Wong, on October 9, 2019, along with the Dealer Agreement signed by 18W, Michael Wymard, an employee of 18W, sent Mr. Wong an email enclosing registration and incorporation documents for 18W and its owner MEM Investments.").)

Similarly, in Count V, Plaintiff alleges that Defendant fraudulently induced Plaintiff to enter into the Dealer Agreement by making "false promises that it would provide effective and professional support and customer service to purchasers." (*Id.* ¶ 107.) Specifically, Plaintiff alleges that Mr. Wong stated to Mr. LaMotta during the negotiations that Defendant's customer service agents would: (i) "keep separate business records for 18W and limit their communications with 18W's customers to the business of 18W," (ii) "be easily accessible and [] respond promptly to 18W's customers," and (iii) "immediately notify 18W when its customers dispute the charges for the VSC." (Am. Compl. ¶¶ 42–43.) However, there are no allegations that the representations were false at the time that they were made, or that the representations were made with knowledge of their falsity, as required to state a claim for fraudulent inducement. *See RNC Sys.*, 861 F. Supp. 2d at 451. Nor is it plausible that Plaintiff relied on these representations to sign a Dealer Agreement that expressly "supersede[d] any previous and contemporaneous negotiations, representations, and agreements between the parties . . ., whether written or verbal," including representations about customer service. (*See* Dealer Agreement § 13(j)); *see also RNC Sys.*, 861 F. Supp. 2d at 454 ("It is manifestly unreasonable for a party to rely on prior oral statements when

10

the express language of the contract is written explicitly nullifying any previous agreements, oral or written[,] . . . especially [] when the parties to the contract are particularly experienced, knowledgeable business people." (citation and internal quotation marks omitted)). The alleged facts do not support an inference that Defendant knowingly made false statements to induce Plaintiff to sign the Dealer Agreement, requiring this Court to void the parties' contract. Counts II and V will therefore be dismissed.

### IV. CONCLUSION

For the reasons set forth above, this Court finds that Plaintiff's injuries, as alleged in the Amended Complaint, flow from Defendant's alleged breach of the Dealer Agreement. Accordingly, Defendant's partial Motion to Dismiss is **GRANTED** and Counts II – V are **DISMISSED WITHOUT PREJUDICE**. Plaintiff may pursue its breach of contract claim (Count I) in the normal course. If appropriate, Plaintiff may move to amend its complaint and replead the dismissed claims following discovery. An appropriate order follows.

                                                  /s/ Susan D. Wigenton
                                      **SUSAN D. WIGENTON, U.S.D.J.**

Orig:        Clerk
cc:          Leda D. Wettre, U.S.M.J.
              Parties